[Cite as *State v. Dodson*, 2012-Ohio-5576.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### SENECA COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                  CASE NO. 13-10-47

    v.

MICHAEL A. DODSON,                      O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Union County Common Pleas Court
Trial Court No. 09-CR-0090

**Judgment Affirmed**

**Date of Decision: December 3, 2012**

APPEARANCES:

    *Kent D. Nord* for Appellant

    *Derek W. DeVine* for Appellee

**SHAW, P.J.**

{¶1} Defendant-appellant Michael A. Dodson ("Dodson") appeals the judgment of the Court of Common Pleas of Seneca County sentencing Dodson to forty years in prison after a bifurcated trial wherein a jury found him guilty of attempted murder, a felony of the first degree in violation of R.C. 2923.02 and 2903.02, and aggravated robbery, a felony of the first degree in violation of R.C. 2911.01, and the court found him guilty of the specifications on each charge that Dodson was a repeat violent offender.

{¶2} On January 24, 2004, Shanna Long ("Long") was working at a Subway restaurant in Fostoria, Ohio. The store closed at 10:00 p.m. for the day. Around closing time, a man came into the Subway and stabbed Long multiple times with a knife. Just before closing time, two customers came to the Subway and realized something was wrong when the door was open, the lights were on, and no one was around. The customers, Tiffany Kizer and Zach Bugner, then stopped Fostoria Police Officer Dan Dell ("Dell") to investigate. Dell found Long in the restaurant and called for medical assistance. The EMT's arrived and found Long near death. She was life-flighted to Toledo where she was hospitalized for stab wounds to her face, head, and body. The Fostoria Police Department and the Bureau of Criminal Investigation and Identification investigated the scene at the restaurant and determined that the cash register drawer was missing.

{¶3} The Seneca County Grand Jury indicted Dodson on April 22, 2009, for the events occurring on January 24, 2004. Dodson was charged with one count of attempted murder, a felony of the first degree, in violation of R.C. 2923.02 and 2903.02, and one count of aggravated robbery, a felony of the first degree, in violation of R.C. 2911.01. Both counts contained specifications that Dodson was a repeat violent offender. On May 18, 2009, Dodson was arraigned and entered pleas of not guilty to both counts. The trial was bifurcated, with the aggravated robbery and attempted murder charges to be tried by a jury, and the repeat violent offender specifications to be tried by the court should Dodson be convicted.

{¶4} A jury trial was held from November 8 to November 15, 2010. The jury returned verdicts of guilty to both the aggravated robbery and the attempted murder charges. On November 18, 2010, the repeat violent offender specifications were tried before the court and Dodson was found guilty on both counts. The sentencing hearing was held that same day on November 18, 2010. The trial court sentenced Dodson to ten years in prison on each count and on each specification, with all terms to be served consecutively for a total prison term of forty years. Dodson appeals from this judgment and raises the following assignments of error for our review.

**First Assignment of Error**

**The conviction in the trial court should be reversed because it is against the manifest weight of the evidence and because the**

evidence supporting it was insufficient as a matter of law to prove the conviction beyond a reasonable doubt.

**Second Assignment of Error**

[Dodson] was deprived of his rights to effective assistance of counsel by his court-appointed counsel, in contravention of the Sixth and Fourteenth Amendments to the United States Constitution and Article One, Section Ten of the Ohio Constitution, which severely prejudiced the rights of [Dodson] and did not further the administration of justice.

**Third Assignment of Error**

The trial court erred when it admitted into evidence State's Exhibit 20 over the objection of [Dodson].

**Fourth Assignment of Error**

The trial court erred when it admitted into evidence State's Exhibit 21 over the objection of [Dodson].

**Fifth Assignment of Error**

The trial court erred when it admitted into evidence State's Exhibit 23 over the objection of [Dodson].

**Sixth Assignment of Error**

The delay of thirty (30) months from identifying Dodson as the suspect until indicting him was equivalent to prosecutorial misconduct and the unreasonable delay also severely prejudiced Dodson.

**Seventh Assignment of Error**

[R.C. 2929.01(CC) is unconstitutional because it violates [Dodson's] right to due process under the Fourth and Fourteenth Amendments to the Constitution of the United States and Article I, Section 10, of the Constitution of the State of Ohio.

## Eighth Assignment of Error

**The trial court violated [Dodson's] right to due process under the Fourth and Fourteenth Amendments to the Constitution of the United States and Article I, Section 10, of the Constitution of the State of Ohio when it applied [R.C. 2929.01(CC) and 2941.149] in this matter.**

## Ninth Assignment of Error

**The trial court erred in sentencing Dodson for the offenses of Attempted Murder and Aggravated Burglary[1] (sic) because Attempted Murder and Aggravated Burglary are allied offenses of similar import, requiring merger of the offenses for purposes of sentencing.**

## Tenth Assignment of Error

**The trial court erred when it failed to given (sic) an instruction pursuant to CR 409.05 regarding eyewitness credibility.**

## Eleventh Assignment of Error

**The trial court erred when it failed to immediately declare a mistrial when the Prosecuting Attorney asked the Witness, Detective Dennis Reffner, whether Chris Long had taken and passed a lie detector test.**

{¶5} In the interest of clarity, the assignments of error will be addressed out

of order.

---

[1] In his assignment of error, Dodson alleges that convictions for aggravated burglary and attempted murder are allied offenses. However, Dodson was charged with, and convicted of, aggravated *robbery* and attempted murder.

*Sixth Assignment of Error: Pre-Indictment Delay*

{¶6} In the sixth assignment of error, Dodson alleges that the prosecutor engaged in misconduct when it waited thirty (30) months to indict him. Dodson claims this delay prejudiced him because witnesses died and records were lost due to the delay. The Ohio Supreme Court has held that the guarantee of a speedy trial granted by the Ohio Constitution is applicable to unjustified delays before the indictment. *State v. Meeker*, 26 Ohio St.2d 9 (1971). Pre-indictment delay that results in actual prejudice to a defendant "makes a due process claim concrete and ripe for adjudication." *United State v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, (1971). The key is determining whether actual prejudice resulted from the delay. *State v. Luck*, 15 Ohio St.3d 150 (1984).

{¶7} Here, this court recognizes that Dodson did not raise this issue until this appeal. At no time did the trial court have the opportunity to address the issue. Therefore, the matter will be addressed using a plain error standard. *State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325. A review of the record indicates that Dodson did not present any evidence concerning how he was prejudiced by the delay. Instead, he speculates in his brief about how the delay might have affected his case. Thus, the record is devoid of any evidence that Dodson was prejudiced by the delay. The sixth assignment of error is overruled.

*Third, Fourth, and Fifth Assignments of Error: Admission of Evidence*

**{¶8}** In the third, fourth, and fifth assignments of error, Dodson challenges the admission of State's exhibits 20, 21, and 22. "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court[.]" *State v. Haines,* 112 Ohio St.3d 393, 2006–Ohio–6711, ¶50, 860 N.E.2d 91. This includes the admission of photographic evidence. *State v. Awkal*, 76 Ohio St.3d 324, (1996). An abuse of discretion is more than an error in judgment, but requires that the trial court's judgment be unreasonable, arbitrary, or unconscionable. *State v. Spires*, 4th Dist. No. 10CA10, 2011-Ohio-3661, ¶18.

**{¶9}** Dodson argues in the third assignment of error that the trial court erred in admitting exhibit 20, photographs of a bloody rag, because they were cumulative to the rag itself which was also admitted. Cumulative evidence is that which goes to prove the same point already proven by other evidence. *State v. Siller*, 8th Dist. No. 90865, 2009-Ohio-2874. Photographs of an item that has already been admitted may potentially be cumulative evidence, however, there are certainly foreseeable instances when they would not be, for example when depicting the location or condition of the item at the crime scene, and it is well within the trial court's discretion to make such a determination. In this instance, there is no evidence that Dodson was prejudiced by the admission of the photographs and the record does not indicate that the trial court's decision to admit

exhibit 20 was unreasonable, arbitrary, or unconscionable. The third assignment of error is overruled.

{¶10} In Dodson's fourth assignment of error, he argues that exhibit 21, photographs of his hands, should have been excluded because there was no testimony as to what caused the marks or that they were linked to the incident in question.[2] A review of the record shows that Officer Gabriel Wedge testified that he began reviewing the case in 2009. As part of that review, he observed Dodson's hands and saw several marks. He admitted on the stand that he did not know what caused the marks or what they were.

{¶11} There was some other evidence given regarding Dodson's hands from Kelly Vallejo who testified that Dodson had a cut on the palm of his hand about three inches long. Tr. at 485. Further, Chris Vallejo testified that he noticed Dodson's hand wrapped in a cloth with some red on it. Tr. at 467. Thus there is some basis for the admission of the photographs. However, even if this basis was determined to be insufficient, all of the points raised by Dodson could have been raised on cross-examination to impeach the credibility of the witnesses and to point out to the jury how the evidence was not connected. The record does not show that the decision to admit the evidence was arbitrary, unreasonable, or unconscionable. The fourth assignment of error is overruled.

---

[2] Viewing the photographs, no scars or marks were evident in them.

{¶12} In the fifth assignment of error, Dodson argues that exhibit 23, a photograph of the defendant used in the lineup of exhibit 19, was cumulative and should not have been entered. As discussed above, the mere fact that evidence is cumulative does not make it prejudicial. While the evidence in this instance may be cumulative, no prejudice was shown or even claimed by Dodson. Therefore, the fifth assignment of error is overruled.

*Eleventh Assignment of Error: Mistrial*

{¶13} Dodson argues in the eleventh assignment of error that the trial court erred by denying a motion for a mistrial when Detective Dennis Reffner was asked whether Chris Long had taken and passed a lie detector test. Generally, the denial of a motion for a mistrial is within the sound discretion of the trial court. *State v. Garner*, 74 Ohio St.3d 49, 656 N.E.2d 623 (1995). A jury is presumed to follow the curative instruction given by the trial court to disregard any evidence to which an objection is sustained. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, at ¶ 39. Mistrials should only be granted in those situations in which a fair trial becomes impossible. *State v. Franklin*, 62 Ohio St.3d 118, 580 N.E.2d 1 (1991).

{¶14} At the outset, we note that Dodson never requested a mistrial *or* was denied a mistrial. Dodson is arguing that the court should have *sua sponte* declared a mistrial once Detective Dennis Reffner mentioned the polygraph test. In Dodson's brief he points to the ruling on the *Motion in Limine* wherein the State

was precluded from putting on testimony of Chris Long's polygraph results in its case-in-chief. The State actually complied with this ruling and did not put on any testimony of the polygraph results in its case-in-chief.

{¶15} Instead, the *defense* called Detective Dennis Reffner and asked him where he interviewed Chris Long. Tr. 720. After mentioning some of the places he interviewed Chris Long, Reffner said "Uhm, I, uhm, arranged for a polygraph test for him." Tr. at 720. The State asked no questions about the polygraph on cross-examination. Then on redirect examination, *defense counsel* asked

**Q. And what all did you do to investigate Chris Long?**

**A. Primarily polygraph that was conducted at Tiffin PD.**

**\* \* \***

**Q. Have you had a chance to review those documents?**

**A. Yes, ma'am.**

**Q. And have they refreshed your recollection simply on the point of when the polygraph examination would have occurred?**

**A. Yes, ma'am.**

**\* \* \***

**Q. So the crime occurred on January 24, 2004 and by March 9, 2004 Mr. Long was no longer a suspect?**

**A. That's when the polygraph had occurred. It took some days to get the report back in, obviously.**

Tr. 725-26. It is only after this exchange, on re-cross examination, once the polygraph had been mentioned multiple times in direct and re-direct by the defense that the State asked,

> **Q. Isn't it true officer that Chris Long passed the polygraph examination.**
>
> **MS. SNYDER: Objection, Your Honor.**
>
> **THE COURT: Sustained. Jury should disregard the question. And there has been no answer. Should disregard it.**

Tr. 727.

{¶16} Dodson claims that a fair trial became impossible after this exchange. However, before any answer was given, Dodson's counsel objected and the trial court sustained the objection. *Id.* Moreover, the trial court then instructed the jury to disregard the question. *Id.* Furthermore, the question arose after Dodson's counsel asked where and when the polygraph was done. At that time, no additional action was requested by Dodson. The fleeting reference to the polygraph test results, the lack of an answer by the witness to the question, the trial court's curative instructions to the jury, and Dodson's lack of request for further curative measures demonstrates no error by the trial court in failing to *sua sponte* grant a motion for a mistrial. The eleventh assignment of error is overruled.

*First Assignment of Error: Sufficiency and Manifest Weight of the Evidence*

**{¶17}** In the first assignment of error, Dodson claims that the verdict was not supported by sufficient evidence and was against the manifest weight of the evidence.

> **Sufficiency of the evidence is a test of adequacy used to "determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." * * * A conviction based on insufficient evidence constitutes a denial of due process, and the defendant may not be recharged for the offense. * * * In reviewing a claim under the sufficiency of the evidence standard, an appellate court must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."**

*State v. Alvarado*, 3d Dist. No. 12-07-14, 2008-Ohio-4411, ¶23 (citations omitted).

**{¶18}** The State presented the following testimony in support of its case. Captain Daniel Dell of the Fostoria Police Department testified that when he arrived on the scene, he found the victim lying on the floor in a large puddle of blood. Tr. 202. He said there was blood all over the scene. Tr. 207. The cash storage drawer was apparently missing. Tr. 210. He did admit that the owner did not report anything missing. Tr. 220. Once the agents from the Bureau of Criminal Investigation and Identification ("BCII") arrived on the scene, he turned it over to them. Tr. 209.

{¶19} Sergeant Glyn Kidd who had been with the Fostoria Police Department at the time of the incident testified that he also responded to the scene. Tr. 225. He testified that the scene looked like the victim was processing an order when she was attacked. Tr. 237. He based his conclusion that a robbery occurred upon his experience and because the scene looked like one had occurred. Tr. 247.

{¶20} Agent Keith Williamson, a special agent with BCII, testified that he was told it was a robbery and assault before he arrived. Tr. 272. When he arrived on the scene, he noted that the back door was still locked and that there was blood everywhere. Tr. 273. He also noticed that there were completed sandwiches and that the cash drawer appeared to be missing. Tr. 273. He then processed the scene, taking numerous samples from areas that might have had the perpetrator's blood if he had cut himself. Tr. 287. According to the scene, it appeared that the victim was stabbed while on her knees or low to the floor. Tr. 288. On February 17, 2005, he met with the victim and helped her draw a composite of a suspect. Tr. 292. The victim told him that a customer had placed an order, but had forgot his wallet. Tr. 304. He then left to get money. Tr. 304. She heard someone enter and was attacked. Tr. 304. The composite was of the customer who was a suspect. Tr. 304.

{¶21} Lieutenant Warren Digby was an emergency medical technician with the City of Fostoria when he was dispatched to the Subway. Tr. 313. When he

entered the building, he saw the blood, and then the victim lying in a pool of blood. Tr. 315. He initially thought she was dead, but she opened her eyes when he touched her. Tr. 315. Digby described her injuries as numerous puncture wounds to her face, head, neck, chest, and arms. Tr. 318. The victim had more than a dozen stab wounds. Tr. 321.

{¶22} Ronda Hull, a friend of the victim, testified that she was in the Subway store on the day of the incident approximately 30 minutes before closing. Tr. 340. She saw a man acting strange and talking on his cell phone at the store. Tr. 328. She described the man as white, 5'7" to 5'9" with dark hair, wearing light jeans and a short black leather jacket. Tr. 329. Hull testified that the victim had told her the man had been there a while, but still had not ordered. Tr. 330. When shown a photo line-up, she was unable to identify the man. Tr. 332. She also was not able to identify the defendant in court as the man she saw. Tr. 332.

{¶23} The victim testified that the night of the attack, she made subs for a customer, but he left to get money. Tr. 350. It was near closing time, so she started to clean and prepare the area for the next day. Tr. 350. She heard someone enter, glanced up, and was hit in the head. Tr. 350. She then blacked out. Tr. 350. She worked with the officer to make the composite sketch of the person who made the order. Tr. 365. The final sketch was not quite correct as his hair was wrong. Tr. 357. In court, the victim identified the defendant as the man who

made the order, but she was not completely sure. Tr. 352. She also did not know if the man who ordered the subs and then left was the same person who attacked her. Tr. 366. She described the customer as wearing a trench coat that came to mid-thigh. Tr. 372.

{¶24} James Potter was a former cell mate of Dodson prior to the event at issue. At the time of the trial, Potter was in prison for another offense. He had also been a suspect in the Subway robbery. Tr. 385-87. He testified that the night of the Subway incident, Dodson had called him to ask him if he wanted to go out to make money that evening. Tr. 378. He testified that Dodson frequently wore a vinyl coat with a hood or a hoodie. Tr. 380. He also testified that Dodson owned a short, single edge boot knife. Tr. 380. He recalled that he never saw Dodson with that knife after the incident at Subway. Tr. 381. Potter saw Dodson a couple days after the incident and knew that Dodson went to Tennessee to be with family in April of 2004. Tr. 382. According to Potter, Dodson was a frequent user of crack cocaine at the time of the attack. Tr. 383.

{¶25} Jeremiah Clay had been at the Hancock County Jail with Potter and learned details of the crime from Potter. Tr. 402. He was then transferred to the Seneca County Jail where Dodson was held and spent time with him in the yard. Tr. 405. He testified that in April of 2010, Dodson told him that "the bitch got what she deserved." Tr. 396. He also said that Dodson told him that he "cut the

bitch," but that there was no evidence. Tr. 397. Although Clay did not get a deal for testifying, he does have a motion for judicial release pending. Tr. 401.

{¶26} Janelle Turpin testified that Dodson was a friend of her boyfriend, Chris Vallejo, at the time. Tr. 444. On the evening in question, she received a call to pick up Dodson and she did. Tr. 446. She testified that Dodson was wearing a jacket and carrying a duffel bag, and that she noticed nothing unusual about his appearance. Tr. 447, 450. She then took Dodson to Fremont and dropped him off at a house. Tr. 449.

{¶27} Chris Vallejo was a friend and coworker of Dodson at the time of the incident. Tr. 459. He testified that on January 24, 2004, he was at Turpin's apartment along with Dodson. Tr. 461. Dodson then left and later called them for a ride. Tr. 462. He testified that they picked up Dodson walking on the main road wearing blue jeans and a short black leather jacket. Tr. 465, 474. Then all three of them went back to Turpin's apartment. Tr. 466. He testified that he saw Dodson's hand wrapped in a white cloth with some red on it and that Dodson offered him some Subway stamps. Tr. 467. The next morning Dodson was at the apartment and all three of them drove to the Vallejo house, where Kelly Vallejo was sleeping. Tr. 469. Dodson left the house and was not seen again. Tr. 472.

{¶28} Kelly Vallejo testified that she was Chris Vallejo's sister and that she had previously dated Dodson. Tr. 481. On January 24, 2004, she was supposed to

go out with a friend, but either Chris Vallejo or Turpin called that night and asked her to come over instead. Tr. 482. She went to Turpin's apartment and they were watching television when Dodson walked into the apartment. Tr. 483. Kelly Vallejo testified that Dodson was wearing a t-shirt and jeans. Tr. 484. The t-shirt was covered in blood and he had a cut on his right hand. Tr. 484. The cut was on the palm of his hand and was about 3" long and heavily bleeding. Tr. 485. The injury needed stitches in her opinion. Tr. 486. At approximately 10 pm, Dodson changed his clothes and asked her to take him to Toledo. Tr. 487. She testified that she only took him because he held a knife to her. Tr. 503. She then drove Dodson to Toledo and waited in the car for approximately 20 minutes while he was in a house. Tr. 489. They then went to a Days Inn in Findlay where she checked them into the hotel with cash that Dodson gave her while he waited in the car. Tr. 489-90. The next day they went back to Fostoria and stopped at the Clark Station where he went in and she waited in the car for an extended time. Tr. 493. From there they went to the Meijer's store in Newark where Dodson went into the store and she waited in the car for an hour. Tr. 491. She then checked them into a hotel in Newark. Tr. 491. After that they went to a hotel in Columbus where she again checked them into a hotel with cash that Dodson gave her. Tr. 494-96. Dodson had a couple of duffel bags with him. Tr. 497. One of the bags contained a roll of subway stamps and a stack of cards to put the stamps on. Tr. 498-99.

When Dodson left, she locked him out of the room. Tr. 499. She testified that Dodson threatened to kill her if she told anyone. Tr. 501. When he left, she went to the hotel lobby and called her mother to come get her. Tr. 503. She waited in the lobby until her mother and grandparents came to get her and then her mom rode home with her in her car. Tr. 503. Although she had multiple chances to leave, escape, or get help, she did not try to do so. Tr. 507-14. She testified that she was too afraid of Dodson to leave. Tr. 519. As to why Chris Vallejo did not know what happened, she had no explanation since they were both living with their parents at the time. Tr. 517. She also did not attempt to have Dodson prosecuted for kidnapping her. Tr. 521.

{¶29} Christa McMonigal Martin testified that she lives in the vicinity of the Subway store. Tr. 528. The day after the attack, she found a napkin or rag with blood on it in her drive. Tr. 528. She eventually contacted the police and they came and retrieved it. Tr. 529.

{¶30} Officer Stanley Sayre of the Fostoria Police Department testified that he was dispatched to retrieve the bloody cloth. Tr. 537. He picked it up at approximately 4:47 pm on January 26, 2004. Tr. 541. Martin had told him that she had originally thrown it in the garbage, but had pulled it out when she realized that it might be important. Tr. 543.

{¶31} Julie Cox is a forensic scientist with BCII. She testified that she tested the blood on the cloth. Tr. 564. The DNA came back as a match to that of Dodson. Tr. 564. However, no blood from the victim was found on the cloth. Tr. 569.

{¶32} Officer Gabriel Wedge of the Fostoria Police Department testified that he began reviewing the case in 2009. Tr. 576. All of the blood found at the scene belonged to the victim. Tr. 589. The bloody shoe prints that were found were consistent with the shoes worn by the police and the EMT's. Tr. 589. Two knives were taken from Subway and tested for blood. Tr. 602. No blood was found on them. Tr. 603. A third knife was found a couple blocks away in March of 2004. Tr. 603. It also was tested and was negative for any DNA from either the victim or Dodson. Tr. 603. He examined Dodson's hands and noted several scars. Tr. 607. However, he was unable to say what had caused them or when they occurred. Tr. 607-12. He also testified that the last sub transaction was incomplete because the sandwiches were still there. Tr. 677. No DNA of Dodson was found at the scene. Tr. 674. Wedge stated that the victim had told him that the attack could be the result of problems she had been having with her husband's ex-girlfriend. Tr. 666. He also stated that he had been told that the husband's behavior was unusual, but did not interview him. Tr. 674.

{¶33} The defense presented the testimony of Detective Dennis Reffner, who was the detective in charge of the case in 2004. He testified that another woman told him that she saw a man coming out of the Subway right before closing, talking on a cell phone and agitated. Tr. 713-14. The woman viewed a photo line-up on January 31, 2004, and identified the victim's husband as the man she saw. Tr. 717-719. However, he also testified that he cleared the victim's husband as a suspect. Tr. 724.

{¶34} Although much of the evidence in this case does not directly link Dodson to the crimes for which he is charged, there is considerable circumstantial evidence. The evidence shows that the cash drawer was missing and that the victim was repeatedly stabbed during the robbery. Given that two witnesses, Chris and Kelly Vallejo, testified that they observed Dodson with a stack of Subway cards and a roll of Subway stamps, a reasonable juror could infer that he took those from the Subway store. Kelly Vallejo also testified that Dodson paid for the hotels with cash. Potter testified that Dodson had a knife and it had not been seen since the incident. Finally, there is the testimony of Clay that Dodson admitted to stabbing the victim and robbing the subway. Viewing this evidence in a light most favorable to the State, a reasonable juror could conclude that Dodson was the one who committed the robbery and repeatedly stabbed the victim. Thus, the conviction is supported by sufficient evidence.

{¶35} Unlike sufficiency of the evidence, the question of manifest weight of the evidence does not view the evidence in a light most favorable to the prosecution.

> **Weight of the evidence concerns "the inclination of the *greater amount of credible evidence,* offered in a trial to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief.*"**

*State v. Thompkins*, 78 Ohio St.3d 380, 387, (1997) (citing Black's Law Dictionary (6 Ed.1990) 1594). A new trial should be granted only in the exceptional case in which the evidence weighs heavily against conviction. *Id*. Although the appellate court acts as a thirteenth juror, it still must give due deference to the findings made by the jury.

> **The fact-finder, being the jury, occupies a superior position in determining credibility. The fact-finder can hear and see as well as observe the body language, evaluate voice inflections, observe hand gestures, perceive the interplay between the witness and the examiner, and watch the witness' reaction to exhibits and the like. Determining credibility from a sterile transcript is a Herculean endeavor. A reviewing court must, therefore, accord due deference to the credibility determinations made by the fact-finder.**

*State v. Thompson*, 127 Ohio App.3d 511, 529 (8th Dist. 1998).

{¶36} Appellate counsel for Dodson points out that the State failed to present testimony from the store owner that items, such as the cash or Subway

cards and stamps, were actually missing from the store. Instead the State focused on the fact that it *appeared* that the cash drawer and cash were missing. There was also no evidence that the store had ever participated in the Subway card and stamp promotions and would have those items in the store to be stolen. However, there was testimony that that the cash drawer was missing, that Dodson paid for all of the expenses with Kelly Vallejo with cash, and that Dodson had a roll of subway stamps.

{¶37} There was also a substantial amount of credible, circumstantial evidence against Dodson, which included Dodson's own confession to a fellow inmate, Dodson's blood on a napkin near the subway store and identification by the victim. The credibility of the witnesses was determined by the jury and this court must give deference to those determinations. The jury heard the testimony of the witnesses including all of the inconsistencies and determined what portions of their testimony to believe. A new trial is only to be granted in cases where the evidence weighs heavily against conviction and a manifest injustice has occurred. That is not this case. This court does not find that the evidence weighs heavily against conviction. Therefore, the verdict is not against the manifest weight of the evidence. The first assignment of error is overruled.

*Tenth Assignment of Error: Jury Instructions*

**{¶38}** In the tenth assignment of error, Dodson alleges that the trial court erred when it failed to instruct the jury on eyewitness credibility. "A criminal defendant has a right to expect that the trial court will give complete jury instructions on all issues raised by the evidence." *State v. Williford*, 49 Ohio St.3d 247, 251, (1990). However, Criminal Rule 30 requires an objection for an error for appeal.

> **At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. * * ***
>
> **On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury.**

Crim.R. 30(A). A review of the record indicates that Dodson did not request and did not object to the failure of the trial court to give an instruction concerning eyewitness credibility. Thus, the issue will be reviewed under a plain error standard. When eyewitness testimony is not inherently unreliable and the general instruction covers the requirement that identity be established beyond a reasonable doubt, no additional instructions are required. *State v. Coffman*, 16 Ohio App.3d 200 (10th Dist. 1984). As long as the general instructions sufficiently set forth

that the jury is responsible for determining the credibility of witnesses and that the identity of the perpetrator must be proven beyond a reasonable doubt, no additional instructions are needed on the issue of witness testimony. *State v. Guster*, 66 Ohio St.2d 266 (1981).

**{¶39}** Here, the trial court instructed the jury as follows.

**\* \* \* To weigh the evidence you must consider the credibility of the witnesses, and you will apply the tests of truthfulness which you are accustom to apply in your daily lives.**

**You may consider the appearance of the witnesses upon the witness stand; the manner of testifying; the reasonableness of the testimony; the opportunity each witness had to see, hear and know the things concerning their testimony; accuracy of memory; frankness, or lack of it; intelligence, interest and bias; if any, together with all the facts and circumstances surrounding the testimony. Applying these tests you will assign to each witness such weight as you deem proper.**

**\* \* \***

**Now, you're not required to believe the testimony of any witness simply (sic) he or she was under oath. You may believe or disbelieve all or any part of the testimony of any witness. It is your province to determine what testimony is worthy of belief and what testimony is not worthy of belief. You should not decide any issue of fact merely on the basis of the number of witnesses who testify on each side of such issue. Rather the final test in judging evidence is the force and the weight of the evidence regardless of the number of witnesses on each side of any issue. The testimony of one witness believed by you is sufficient to prove any fact.**

**Now, discrepancies in a witness' testimony, or between her testimony or his testimony and that of others, if there are any, does not necessarily mean that you should disbelieve the people –**

**the witness as people common (sic) forget facts or recollect them erroneously after the passage of time. You're certainly all aware of the fact that two persons who are witnesses to an incident may often see and hear it different. In considering a discrepancy in a witness' testimony you should consider whether such discrepancy concerns an important fact or a trivial one.**

**\* \* \***

**The defendant is presumed innocent until his guilt is established beyond a reasonable doubt. The defendant must be acquitted unless the State of Ohio produces evidence which convinces you beyond a reasonable doubt of every essential element of the crimes charged in the Indictment.**

Tr. 753-56. These instructions adequately set forth that the jury is the sole determiner of the credibility of the witnesses and sets forth the standards to be used by the jury in making that determination. In addition, the trial court specifically instructed the jury that the defendant is presumed innocent until his guilt is proven beyond a reasonable doubt by the State. Thus, the trial court did not err by not giving any additional instructions. The tenth assignment of error is overruled.

*Ninth Assignment of Error: Allied Offenses of Similar Import*

{¶40} Dodson argues in his ninth assignment of error that attempted murder and aggravated robbery—though he mistakenly refers to aggravated burglary—are allied offenses of similar import that required merger at sentencing. Initially, we note that Dodson never raised the issue of merger at sentencing. However, the Ohio Supreme Court has determined that the imposition of multiple sentences for

allied offenses of similar import is plain error. *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, at ¶ 31, and *State v. Yarborough*, 104 Ohio St.3d 1, 2004-Ohio-6087. Thus despite Dodson's failure to bring this issue to the trial court's attention, we must analyze whether Dodson's offenses should have been merged.

**{¶41}** In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, the Ohio Supreme Court recently modified its prior tests for determining whether offenses are allied offenses of similar import. In *Johnson*, the Ohio Supreme Court emphasized the General Assembly's intent in directing courts to apply R.C. 2941.25, "which expressly instructs courts to consider the offenses at issue in light of the defendant's conduct."[3] *Johnson*. at 162, 2010-Ohio-6314, ¶ 46. What follows is the language of *Johnson* laying out the new test.

> **In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. * * * If the offenses correspond to such a degree that** *the conduct of the defendant constituting commission of one offense constitutes commission of the other,* **then the offenses are of similar import.**

---

[3] Section 2941.25 of the Revised Code states:

> **(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.**

> **(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.**

> **If the multiple offenses *can* be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind."**
>
> **If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.**
>
> **Conversely, if the court determines that the commission of one offense will *never* result in the commission of the other, *or if the offenses are committed separately, or if the defendant has separate animus for each offense,* then, according to R.C. 2941.25(B), the offenses will not merge.**

*Johnson*, 128 Ohio St.3d at 163, 2010-Ohio-6314, ¶¶ 48-51. (Emphasis added).

Though this analysis was established only by a plurality, the plain error determination of this issue appears to be made by all district courts of appeal in Ohio addressing the issue of merger post-*Johnson*, with the exception of the ninth district.[4] *See State v. Tibbs*, 1st Dist. No. C-100378, 2011-Ohio-6716, *State v. Alsup*, 2nd Dist. No. 23641, 2011-Ohio-3612, *State v. Rowe*, 3d Dist. No. 13-10-14, 2011-Ohio-5739, *State v. Humphrey,* 4th Dist. No. 10CA3150, 2011-Ohio-5238, *State v. Brenson*, 5th Dist. No. 09-CA-18, 2011-Ohio-1880, *State v. Ruby*, 6th Dist. No. S-10-028, 2011-Ohio-4864, *State v. Bickerstaff*, 7th Dist. No. 09 JE 33, 2011-Ohio-1345, *State v. Jackson*, 8th Dist. No. 92531, 2011-Ohio-6069, *State*

---

[4] Only the Ninth District Court of Appeals appears to routinely send cases back to the trial court for a determination if merger is appropriate, rather than conduct the analysis itself in the first instance. The Ninth District reasons that "[r]ather than decide this issue in the first instance, we must remand this matter to the trial court for a determination as to whether [defendant]'s offenses are, in fact, allied offenses of similar import." *State v. Truitt*, 9th Dist. No. 25527, 2011-Ohio-6599, ¶ 47; *see also State v. McDaniel*, 9th Dist. No. 25492, 2011-Ohio-5001, *State v. Jones*, 9th Dist. No. 25676, 2011-Ohio-4934.

*v. Rhodehamel*, 10th Dist. Nos. 11AP-96, 11AP-97, 2011-Ohio-5618, *State v. O'Neil*, 11th Dist. No. 2010-P-0041, 2011-Ohio-2202, *State v. McCullough*, 12th Dist. Nos. CA2010-04-006, CA2010-04-008, 2011-Ohio-992.

{¶42} The plurality in *Johnson* lays out a two-part test to decide if offenses should be merged. The first part of the test requires us to ask whether the two offenses *can* be committed by the same conduct, and the second part of the test requires us to ask whether the offenses *were* committed by the same conduct. It then states that if there is a separate animus for each offense, the offenses do not merge.

{¶43} Addressing the first part of the test, we examine the indictment and the relevant statutes to determine whether the charged offenses can be committed by the same conduct. Dodson was charged with attempted murder and aggravated robbery. The statutes for attempted murder read as follows.

**Attempt**

**(A)    No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense.**

**\* \* \***

**(E)(1) Whoever violates this section is guilty of an attempt to commit an offense. An attempt to commit aggravated murder, murder, or an offense for which the maximum penalty is imprisonment for life is a felony of the first degree. \* \* \***

(R.C. 2923.02).

**Murder**

**(B)   No person shall purposely cause the death of another or the unlawful termination of another's pregnancy. * * ***

(R.C. 2903.02).

**{¶44}** The statute for aggravated robbery reads as follows.

**Aggravated robbery**

**(A)   No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:**

**(1)   Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;**

**(2)   Have a dangerous ordnance on or about the offender's person or under the offender's control;**

**(3)   Inflict, or attempt to inflict, serious physical harm on another.**

(R.C. 2911.01).

**{¶45}** Attempted murder requires that the offender purposely attempt to cause the death of another.  Aggravated robbery can be committed multiple ways, one of which includes inflicting or attempting to inflict serious physical harm during the commission of a theft offense.  In fact, inflicting serious physical harm during a theft offense is how Dodson was charged with aggravated robbery in the indictment.

{¶46} In pertinent part, the two count indictment states as follows:

**COUNT ONE**

**On or about the 24th day of January, 2004, in Seneca County, Ohio, MICHAEL A. DODSON did purposely attempt to cause the death of Shanna Long.**

* * *

**ATTEMPTED MURDER A felony of the First Degree**

**COUNT TWO**

**On or about the 24th day of January, 2004, in Seneca County, Ohio, MICHAEL A. DODSON, in committing a theft offense as defined by RC 2913.01, did inflict serious physical harm on Shanna Long.**

* * *

**AGGRAVATED ROBBERY – A felony of the First Degree**

(Doc. No. 1).

{¶47} Applying the first prong of the *Johnson* test to these statutory offenses and to this particular indictment, we find that it would be *possible* for both attempted murder and aggravated robbery to be committed by the same conduct. For example, this would seem to be particularly true where the victim of the serious physical harm leading to the attempted murder was also the victim of the aggravated robbery.

{¶48} Thus, with the first prong in *Johnson* met, we must turn to the second prong of *Johnson* to see whether the two crimes in this case *were* committed by

the same conduct. In the trial court's judgment entry on sentencing, the trial court stated,

> **[t]he Court finds that at least two of the multiple offenses were committed as part of one course of conduct and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the defendant's conduct.**

(Doc. No. 267).

{¶49} According to *Johnson*, the issue to be determined in the second part of the test is not simply whether there is one course of conduct, but whether there is *one course of conduct with one single state of mind*. If there is a separate 'animus' for each crime, then the crimes are not allied offenses even if they are committed in the same course of conduct.

{¶50} The term animus, as defined by the Ohio Supreme Court in *State v. Logan*, 60 Ohio St.2d 126 (1979), means "purpose or, more properly, immediate motive." *Logan* at 131. Thus if Dodson committed the crimes of attempted murder and aggravated robbery with a different purpose or immediate motive even though they were part of the same course of conduct, he would have a separate animus and the offenses would not merge.

{¶51} In the case *sub judice*, Shanna Long was stabbed 27 times to her head, chest, back, and legs. Analyzing the scene of the crime, Agent Keith Williamson testified that it appeared that the victim, Shanna Long, was stabbed

while on her knees or low to the floor. Tr. 288. Furthermore, there is no indication in the record that Shanna Long was injured in the course of impeding the Aggravated Robbery in this case. In fact, Long testifies that she blacked out after being hit in the head. Tr. 350.

{¶52} Moreover, even if Shanna had been the intended victim of the aggravated robbery or in some way incurred the serious physical harm by attempting to physically impede Dodson's efforts to rob her employer, the infliction of serious physical harm in this instance is so excessive as to clearly constitute conduct well over and beyond any infliction of harm necessary to merely facilitate any theft offense or aggravated robbery. As such, the stabbings in this case demonstrate an animus directed to the purposeful attempt to cause death which is entirely separate from any infliction of harm related to the theft offense or aggravated robbery.

{¶53} Other district courts of appeals in Ohio have come to similar conclusions in similar circumstances. In *State v. Tibbs*, the First District Court of Appeals found that evidence of three gunshot wounds to the face and head from relatively close range demonstrated the specific intent to kill the victim separate from the immediate motive of robbing him. *Tibbs supra* at ¶ 43 citing *State v. Garner*, 74 Ohio St.3d at 60, 1995-Ohio-168, *State v. Chaffer*, 1st Dist. No. C-090602, 2010-Ohio-4471, ¶ 11. Because a specific intent to kill separate from the

intent to rob the victim was demonstrated, the court found that murder and aggravated robbery did not merge.

**{¶54}** The Sixth District Court of Appeals came to a similar conclusion in *State v. Ruby* where the court held that attempted murder and burglary did not merge in a situation where an elderly couple was badly beaten while their house was robbed. *Ruby*, *supra*. The court held that

> **there is no indication in the record that the purpose of the beatings was to establish physical control over the [victims] while the burglary and theft were in progress and, in any event, it was hardly necessary under the circumstances for appellant and his co-defendants to beat two frail and elderly victims to the brink of death in order to control them while those offenses were being committed.**

*Ruby* at ¶ 61.

**{¶55}** In sum, based on the foregoing, we find that the evidence clearly supports a determination that the crimes in this case were committed with a separate animus. Specifically, the number of stab wounds inflicted on the victim while she was on her knees, or low to the ground demonstrates a purpose to cause death separate and apart from Dodson's immediate motive of robbing the Subway store. Because there is a separate animus demonstrated within this course of conduct, the trial court did not err by declining to merge the offenses and rendering consecutive sentences in this case.

**{¶56}** The ninth assignment of error is overruled.

*Second Assignment of Error: Ineffective Assistance of Counsel*

**{¶57}** The second assignment of error raises the allegation that Dodson was denied effective assistance of counsel. "Reversal of convictions on ineffective assistance requires the defendant to show 'first that counsel's performance was deficient and, second that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial.'" *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751 at ¶105, quoting *Strickland v. Washington*, 466 U.S. 668, 669, 104 S.Ct. 2052 (1984).

**{¶58}** Dodson alleges that his trial counsel was ineffective for multiple reasons: 1) Counsel failed to ask a single question during *voir dire*; 2) Counsel failed to do more than conduct a basic search for a witness who could place the victim's husband at the scene; 3) Counsel did not request a jury instruction on eyewitness credibility; 4) Counsel failed to seek a forensic expert to testify as to the amount of blood the attacker should have had on his clothes; 5) Counsel failed to seek expert testimony concerning the knife used in the attack; 6) Counsel did not seek an expert witness to discuss crimes of passion; 7) Counsel failed to call a corrections officer from the Seneca County Jail to show that Dodson and Clay had not had any contact in which Clay could have obtained the alleged confession; 8) Counsel failed to present any expert testimony concerning Dodson's hands to testify that there were no scars; 9) Counsel failed to call the other worker at

Subway who could have testified that Dodson was not present; and 10) Counsel erred in not requesting a mistrial concerning the polygraph evidence or in the alternative for opening the door concerning the polygraph.

{¶59} Dodson first claims that his counsel was ineffective for failing to ask a single question during *voir dire*. Dodson does not, however, explain what this error was and how it would be prejudicial. He just states that counsel should ask questions to gather information from the jurors. Without an allegation of prejudice, or how this might have affected the outcome of the trial, there is no basis for finding counsel ineffective.

{¶60} Next Dodson alleges that counsel was ineffective for not doing more than a basic internet search to find a witness who Dodson claims could place the victim's husband at the scene right before closing. Dodson alleges that her testimony would have made a dramatic impact on the jury. However, the same testimony was obtained from Detective Reffner. Any error, therefore, would be harmless.

{¶61} The third claim is that counsel erred by not requesting an instruction on eyewitness credibility. Although counsel could have requested additional instructions concerning eyewitness testimony, there is nothing that mandates it. As discussed above, the jury instructions that were given concerning the reliability of witnesses and the duty of the jury to evaluate the credibility is sufficient to

make any additional instruction unnecessary. Dodson has demonstrated no harm from the trial court not giving the additional instruction.

{¶62} The fourth, fifth, sixth, seventh, eighth, and ninth alleged errors all argue that counsel was ineffective for not calling various witnesses. Dodson claims that testimony concerning the amount of blood he should have had on his clothes (fourth), the type of knife used in the attack (fifth), indications of crime of passion (sixth), the impossibility of Clay speaking to Dodson and getting a confession from him (seventh), the lack of scars on Dodson's hands (eighth), and whether Dodson was in Subway that evening (ninth), would have all had a substantial impact on the jury.

{¶63} It is apparent that some of this testimony, if it had been as Dodson alleges, could have been persuasive to the jury. However, the record does not contain any evidence from which we can determine that said testimony would have occurred. Obviously an appellate court is permitted to consider only what is in the record and this court may not speculate as to what might have been said by various witnesses. The record does not reveal any evidence to support Dodson's claims. Thus, no error has been demonstrated.

{¶64} Finally, Dodson claims that counsel was ineffective because no mistrial was requested after the State asked a question concerning the victim's husband passing a polygraph test. As discussed above, the trial court sustained the

objection to the question before it was answered. The trial court then gave a curative instruction to the jury to disregard it. Given this situation, the trial court properly could have overruled a motion for a mistrial if it had been made. Thus, there was no prejudicial harm by not requesting the mistrial. Having found no prejudicial errors by counsel, Dodson's second assignment of error is overruled.

*Seventh and Eighth Assignments of Error:*
*Constitutionality and applicability of R.C. 2929.01(CC)*

**{¶65}** In Dodson's seventh and eighth assignments of error, he alleges that R.C. 2929.01(CC) and R.C. 2941.149 are unconstitutional because the application of them violated his right to due process. Specifically, Dodson argues that under these statutes, the "repeat violent offender" specifications that he was charged with were inappropriate as the crime which the specifications were based upon occurred after the crime in the case *sub judice*.

**{¶66}** In order to get a repeat violent offender specification conviction, the indictment must specify that the offender is a repeat violent offender. R.C. 2941.149. The indictment in this case clearly specifies Dodson as a repeat violent offender. (Doc. No. 1). R.C. 2929.01(CC) defines a "repeat violent offender" as

> **"Repeat violent offender" means a person about whom both of the following apply:**
>
> **(1) The person is being sentenced for committing or for complicity in committing any of the following:**

**(a) Aggravated murder, murder, any felony of the first or second degree that is an offense of violence, or an attempt to commit any of these offenses if the attempt is a felony of the first or second degree;**

**(b) An offense under an existing or former law of this state, another state, or the United States that is or was substantially equivalent to an offense described in division (CC)(1)(a) of this section.**

**(2) The person previously was convicted of or pleaded guilty to an offense described in division (CC)(1)(a) or (b) of this section.**

{¶67} Dodson claims that he did not have notice that his crimes could form the basis of a future specification. Due process does require that a person have notice of the offense. *State v McGhee*, 3d Dist. No. 17-06-05, 2006-Ohio-5162. However, the law was in effect at the time of the first offense. It is well settled law in Ohio that people are presumed to know the law. *State v. Parker*, 68 Ohio St.3d 283, 1994-Ohio-93. Thus, Dodson is presumed to have knowledge that if he commits a violent first or second degree felony and then later commits a second violent first or second degree felony, he could be charged with a repeat violent offender specification. The statute does not require that Dodson actually be convicted or even charged with the first offense before the second offense occurs. Dodson's due process rights were not violated by the repeat violent offender specification. Accordingly, Dodson's seventh assignment of error is overruled.

{¶68} Finally, in Dodson's eighth assignment of error, he challenges the imposition of consecutive sentences for both repeat violent offender specifications

when, as he claims, they arose from one occurrence. As we held above, Dodson's crimes were not allied offenses of similar import and Dodson had a distinct, separate animus for each crime. Dodson points to no authority in his brief to establish that imposition of consecutive sentences would be inappropriate when his offenses were committed separately with a separate animus.

{¶69} Here, Dodson had a separate animus, or "purpose" as it was also defined in *Logan*, *supra*, illustrated through his specific intent to kill Shanna Long and he could therefore be separately sentenced on the repeat violent offender specifications pertaining to each underlying offense. Accordingly, Dodson's eighth assignment of error is overruled.

{¶70} For the foregoing reasons, Dodson's assignments of error are overruled and the judgment of the Court of Common Pleas of Seneca County is affirmed.

*Judgment Affirmed*

**PRESTON, J., concurs.**

**/jlr**

**WILLAMOWSKI, J., Dissents in Part and Concurs in Part**

{¶71} I dissent from the majority opinion for the following reasons. I would reverse in part on the first assignment of error and on the eighth assignment

of error. As to the first assignment of error, Dodson alleges that the evidence was insufficient as a matter of law to prove the charged offenses beyond a reasonable doubt. I would affirm as to the attempted murder charge, but would reverse as to the count of aggravated robbery. In order to prove an aggravated robbery, there must be evidence of a theft offense or an attempted theft offense. R.C. 2911.01. Here, there was no evidence that a theft occurred or that one was attempted. The State put forth a theory of the crime that Dodson went to the Subway and viciously stabbed the victim multiple times in order to rob the store and obtain money to support a drug habit. However, the victim testified that she was knocked unconscious immediately and does not know what happened. She did not testify that anything was taken or attempted to be taken. The owner of the store did not testify that anything was missing from the store. The cash drawer was not beneath the counter where it was expected, but the evidence shows that there was a cash drawer with cash in it in the back of the store. There was also the victim's purse with her wallet and identification in it. The only evidence that could possibly be used to link Dodson with a theft was the completely incredible testimony of his former girlfriend that he had cash and "Subway" stamps. Even that requires a jury to infer that the cash and stamps were taken from the Subway in question without any evidence that anything was missing. Without some evidence that a theft or

attempted theft occurred, the evidence is not sufficient to prove beyond a reasonable doubt that Dodson committed an aggravated robbery.

{¶72} I also would reverse on the eighth assignment of error. A prosecutor is permitted to place a specification on every offense arising from a criminal transaction. A jury can then find that the facts support the presence of the specification on every offense. However, this does not mean that an offender can be sentenced on every specification. The Ohio Revised Code prohibits sentencing on multiple convictions for the same specification in most cases. Admittedly, the statute is silent when it comes to sentencing on a repeat violent offender specification, such as is present here. Since the statute is silent, it could be presumed that the multiple sentences for the specification is permitted. This, though, does not deal with the concept of merger. When an offense is part of the same transaction and are allied offenses of similar import, you may not sentence on both because the sentences are required to merge. *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314. A specification is not an offense per se, but the same logic that was used in *Johnson* would apply. Here, the two offenses to which the specifications were attached occurred during the same criminal transaction. There was no separation by time or space. The specification that Dodson was a repeat violent offender was placed on both charges. However, Dodson was not a repeat violent offender twice. He had that status at the time of the transaction. Since the

offenses were part of the same transaction, common sense dictates that his status as a repeat violent offender could only be conferred once as well. Therefore, I would find that since the offenses were part of one transaction, Dodson could only be sentenced on one of the specifications, not both.